In re Appeal of AMP, Inc.

IN THE MATTER OF THE APPEAL OF AMP, INCORPORATED, FROM THE DECISION OF THE STATE BOARD OF ASSESS- MENT, SITTING AS THE STATE BOARD OF EQUALIZATION AND REVIEW, AFFIRMING THE ACTION OF THE GUILFORD COUNTY BOARD OF COMMISSIONERS ASSESSING ADDI- TIONAL TAXES, PENALTIES AND INTEREST FOR THE YEARS 1964 THROUGH 1968, INCLUSIVE

No. 7418SC444

(Filed 20 November 1974)

1. **Taxation § 25— valuation — true value in money**

As used in former G.S. 105-294, the test of true value in money in such manner as such property is usually sold, but not by forced sale thereof, is the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

2. **Taxation § 25— ad valorem taxes — electronics manufacturer — goods in process and raw materials — valuation**

The value for ad valorem taxation of the goods in process and raw materials of an electronic components manufacturer was not the scrap value of the goods and materials, since such value would be predicated upon a forced sale, and the goods and materials were properly assessed at their book value for purposes of ad valorem taxa- tion. G.S. 105-294 (now G.S. 105-283).

3. **Taxation § 38— attack on assessment — burden of proof**

The *prima facie* correctness of an assessment made by proper taxing authorities must be affirmatively overcome by the taxpayer by allegation and proof excluding every reasonable hypothesis of legal assessment.

4. **Administrative Law § 5— review of administrative decision**

The superior court may reverse or modify the decision of an administrative agency if the decision is unsupported by competent, material and substantial evidence in view of the entire record as sub- mitted; the agency's decision should be upheld if the evidence support- ing the decision is substantial.

5. **Taxation § 38— valuation by State Board of Assessment — erroneous reversal by superior court**

The superior court erred in reversing and vacating a determina- tion by the State Board of Assessment that a taxpayer had under- valued its inventory for certain years where there was competent, material and substantial evidence in the record to support the Board's determination.

APPEAL by respondent Guilford County from *Exum, Judge,* 25 September 1972 Session of Superior Court held in GUILFORD County. Argued before the Court of Appeals 26 August 1974.

AMP, Incorporated, is a corporation engaged in the manufacture of electronic components in Guilford County and in other locations within and without North Carolina. AMP duly and timely filed with the Guilford County Tax Supervisor "Business Property Abstracts" in accord with G.S. 105-309 for the taxable years 1964 through 1968 inclusive. AMP made timely payments of the taxes for which it was billed as follows:

|      |            |
|------|------------|
| 1964 | $11,555.73 |
| 1965 | 11,724.06  |
| 1966 | 12,026.60  |
| 1967 | 13,534.23  |
| 1968 | 13,044.07  |

Included in the abstracts were the following valuations for current inventories:

|      |             |
|------|-------------|
| 1964 | $399,278.00 |
| 1965 | 448,101.00  |
| 1966 | 460,734.00  |
| 1967 | 454,801.00  |
| 1968 | 238,651.00  |

The Tax Supervisor of Guilford County, purporting and claiming to act under the authority of G.S. 105-331 (now G.S. 105-312), increased the valuation of the inventories to the following amounts:

|      |                |
|------|----------------|
| 1964 | $ 477,769.00   |
| 1965 | 843,327.00     |
| 1966 | 1,205,369.00   |
| 1967 | 1,565,711.00   |
| 1968 | 1,402,489.00   |

The tax supervisor accordingly assessed AMP for additional taxes, penalties, and interest for the undervaluation of inventory as follows:

| Year | Tax         | Penalty     | Total        |
|------|-------------|-------------|--------------|
| 1964 | $   653.83  | $  392.30   | $ 1,046.13   |
| 1965 | 3,472.06    | 1,736.03    | 5,208.09     |
| 1966 | 6,619.81    | 2,647.92    | 9,267.73     |
| 1967 | 9,992.64    | 2,997.79    | 12,990.43    |
| 1968 | 11,039.00   | 2,207.80    | 13,246.80    |
|      |             |             | $41,759.18   |

The valuation of inventories in the assessment was arrived at by the Tax Supervisor and the Board of County Commissioners of Guiford County, which affirmed the assessment, by referring to inventories as shown on North Carolina income tax returns filed by AMP with the State and then deducting therefrom inventories reported to Forsyth County, Mecklenburg County, and Wake County, the balance being attributed to Guilford County.

AMP gave notice of appeal to the State Board of Assessment sitting as the State Board of Equalization and Review (now Property Tax Commission, G.S. 105-288).

At the hearing before the State Board of Assessment, sitting as the State Board of Equalization and Review, appellee AMP introduced evidence which it contends establishes the true cash value of its inventory. Herbert Cole, plant manager for AMP, described the process by which electronic components are produced from brass, copper, and other metals. Metals are purchased in strips approximately five to eight inches wide, which are coiled in large rolls of varying thickness. These coils, upon arrival at the AMP plant in Greensboro, are mechanically slit into narrow strips and are rolled into "pancake" rolls. These are processed through forming dies in order to manufacture a particular terminal, which, in turn, is metal plated. At its Greensboro plant AMP manufactures various types of solderless connectors with terminals which are used in the electronics industry to terminate wires contained in electronic equipment. AMP furnishes its customers with devices which cannot be used until each customer purchases application equipment designed and manufactured by AMP.

In the slitting, forming die, and metal plating stages of manufacture, scrap results due to a number of punching and cutting operations performed upon the metal. Raw material is also scrapped when it is damaged in handling. When 40,000 pounds of scrap have accumulated, AMP contacts its main office in Harrisburg, Pennsylvania, which sells the scrap to suppliers from whom the raw materials were originally purchased. AMP generally ships 40,000 pounds of scrap per week to its suppliers. About 50% of AMP's raw material eventually reduced to scrap; about 40% of the costs of the raw materials is recouped upon sale of scrap to the original suppliers.

Ernest Price, tax manager of AMP, described the method of computation used by AMP in determining the true cash value

---

---

of its inventory. True cash value is computed by deducting from book value direct labor and overhead. The full amount of scrap is then deducted from the in-process material in order to compute true material content. True cash value of the inventories consists of the value that can be realized upon a sale of the raw materials and the goods in process. Dollar figures are determined by comparison of a detailed inventory list to published prices.

In his testimony before the State Board of Assessment, Price emphasized that, due to the nature of products manufactured, AMP's electronic components have only scrap value until the manufacturing process is completed:

"When goods are in process at any stage, halfway through or 90% through, on January 1 of any year, the customer will not accept the item, and you cannot sell it to the customer. He cannot use it. The only place we can use it is to sell it back to the supplier and the only thing the supplier will be receiving is some metal. He doesn't care about the labor and overhead. We have metal for him and what he will pay is the value of the metal. . . . The law of the State asked us what we can get for goods in process on a given date and the answer is that we can get the value of the materials which is scrap value. . . . Raw materials are valued at scrap as well as in-process inventories. There are no other manufacturers of similar products who would buy these substantially at cost, because we have a very peculiar product. It is highly engineered and specifications of those materials are not like cotton or textiles. We have a very special raw material with a very special type of specification and generally speaking no one else can use them because they are made for our specific product."

AMP employed the professional appraisal firm of Dawson, Desmond and Van Cleve, specialists in the appraisal of personal property, to determine true cash value of the inventories for the years 1964 through 1968 inclusive. The Dawson firm listed AMP's ad valorem taxes in each of those years and was retained by AMP solely because AMP did not know how to find the true cash value of its inventory. When appellant Guilford County notified AMP that additional taxes on inventories were owing, AMP began to calculate for itself the value of its inventories. AMP's own calculations show that the Dawson firm overvalued inventories in the years 1964 through 1968 inclusive by $454,718.00.

This discrepancy is attributable to the fact that the Dawson firm "failed to recognize that our raw materials were so unique that we do get nothing but scrap for them." There is no evidence of the Dawson firm's method of computation of the value of inventory.

AMP introduced the expert testimony of William Westphal, a specialist in taxation, who stated: "[H]ere, we are not using a method (of valuation) that anticipates a completion of the goods. We are not assigning an accounting technique, a going concern value to this inventory on the assumption that this is what it is worth to this taxpayer in the course of trade or business. We are trying to determine what the cash value would actually be, and I think these sales prices are the best evidence of the amount into which these goods could be transmuted." Westphal expressed the opinion that G.S. 105-294 (now G.S. 105-283) refers clearly to cash value which is not determined on a forced sale basis, but is determined by calculating "the cash into which these subjects, these properties, might be transmuted at that specific date if sold . . . in an orderly manner following the general procedures of the firm." Westphal testified that book value is used to measure income on certain financial statements, but does not necessarily represent value in cash.

Appellant Guilford County, in the hearing before the State Board of Assessment, introduced the testimony of C. R. Brooks, Tax Supervisor for Guilford County, who stated that the instructions contained in the business property returns required that values should be given to the County directly from the records of the books of a taxpayer. Brooks stated that State income tax reporting and County ad valorem tax reporting is on the same basis, or should be on the same basis. Appellant's further evidence is the testimony of Ronald Waters, Assistant Tax supervisor from 1965 to 1969, who stated that during this period he audited a number of businesses, 95% of which reported property with values for ad valorem tax purposes consistent with the values given to the State for income and franchise tax purposes.

By order of 5 May 1970, the State Board of Assessment found that the value of AMP's inventory for ad valorem tax purposes was represented by the figures reflected in its books and records and that the differences between the book values and the amounts listed for ad valorem tax purposes constituted "unlisted property" and was therefore subject to discovery and

assessment of additional taxes and penalties under G.S. 105-331. The State Board found that the differences between AMP's actual inventory in Guilford County, as reflected by its books and records and the amounts reported to the County by AMP for the years 1964 through 1968, were subject to taxation. The additional amount subject to taxation was determined as follows:

| Year | Actual Inventory in Guilford County | Amount of Inventory Listed by AMP | Additional Amount of Inventory Subject to Tax |
|------|-------------------------------------|-----------------------------------|-----------------------------------------------|
| 1964 | $   464,758.00 | $399,278.00 | $  65,480.00 |
| 1965 | 1,034,066.00 | 448,101.00 | 585,965.00 |
| 1966 | 1,012,055.00 | 460,734.00 | 551,321.00 |
| 1967 | 614,604.00 | 454,801.00 | 159,803.00 |
| 1968 | 400,725.00 | 238,651.00 | 162,074.00 |

The State Board's decision in effect sustained the actions of the Tax Supervisor and the Board of County Commissioners of Guilford County. AMP subsequently appealed to the superior court, which reversed and vacated the decision of the State Board on the grounds that its decision was not supported by competent, material, and substantial evidence and was affected by errors of law. From the superior court's judgment, respondent Guilford County appealed to this Court.

*Adams, Kleemaier, Hagan, Hannah & Fouts, by William J. Adams, Robert G. Baynes, and Paul H. Livingston, for AMP, Incorporated, petitioner-appellee.*

*Ralph A. Walker, for Guilford County, respondent-appellant.*

*Attorney General Carson, by Assistant Attorney General Banks, for Property Tax Commission, amicus curiae.*

BROCK, Chief Judge.

Appellant contends that the superior court committed error when it found that the decision of the State Board of Assessment was not supported by competent, material, and substantial evidence. In order to resolve this question, we have examined in detail the evidence offered by the parties at the hearing before the State Board of Assessment.

The basic controversy involves the interpretation of G.S. 105-294 (now G.S. 105-283), which furnishes the standard by which property is to be valued:

"All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. The

intent and purpose of this section is to have all property and subjects of taxation appraised at their true and actual value in money, in such manner as such property and subjects of taxation are usually sold, but not by forced sale thereof; and the words 'market value,' 'true value,' or 'cash value,' whenever used in this chapter, shall be held to mean for the amount of cash or receivables the property and subjects can be transmuted into when sold in such manner as such property and subjects are usually sold." N. C. Gen. Stat. ch. 105, § 294 (1967), *as amended,* N. C. Gen. Stat. ch. 105, § 283 (1973).

[1]  The important provision of G.S. 105-294 is the requirement that property is to be appraised at its true and actual value in money, in such manner as such property is usually sold, but not by forced sale thereof. We believe that the best and most reasonable test of true value in money, in such manner as such property is usually sold, but not by forced sale thereof, is the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used. The present statute, G.S. 105-283, effective January 1, 1974, adopts such a test.

At the hearing before the State Board of Assessment, appellee strongly contended that is in-process inventory should have been appraised at cash realizable value, a value determined by a sale of goods in process "in their presently existing state at this particular time." Appellee's expert in the field of taxation, William Westphal, stated that "here, we are not using a method that anticipates a completion of the goods. We are not assigning . . . a going concern value to this inventory. . . . We are trying to determine what the cash value would actually be, and I think these sales prices (scrap value) are the best evidence of the amount into which these goods could be transmuted."

[2]  The statment by appellee's expert that appellee is not assigning a going concern value to its inventory, but instead is assigning a scrap value to its inventory, contradicts the express requirement of G.S. 105-294 that true value in money is not to be the value arrived at by forced sale. Implicit in G.S. 105-294 is the going concern assumption. All the evidence introduced

In re Appeal of AMP, Inc.

by appellee at the hearing before the State Board of Assessment recognized that a forced sale would not measure true value in money. Yet, by failing to assign a going concern value to work in process and by arguing for a value determined by calculating the cash into which work in process might be transmitted at a specific date, appellee in effect constructed and used a valuation predicated upon a forced sale. This ignores the provisions of G.S. 105-294.

At the hearing appellee introduced evidence to the effect that it does not sell goods in process in the normal course of busines. Evidence does exist that, in the few instances when appellee sold work in process, it sold such work in process to the original suppliers of raw materials for scrap value. No evidence was introduced to explain why work in process was disposed of rather than completed. The goods in process must have been unsuitable for completion, or appellee would not have sold the goods in process prematurely at a value below cost. There is no evidence that a similar situation exists with respect to appellee's entire inventory.

Appellee does not contend that it would willingly sell its entire inventory, the subject matter of this appeal, at scrap value. Appellee is a going concern and has plans to complete its work in process. It seems clear that no manufacturer would willingly sell its in-process inventory at scrap value unless it had abandoned plans for completing and selling the in-process inventory for a reasonable profit or for a recovery of cost. The burden of proof is on the manufacturer to prove that the book value (cost) assessment made by the taxing authority is excessive. In this case appellee has not carried that burden.

Other jurisdictions have adopted a cost approach to the valuation of goods in process. In *Aeronautical Communications Equipment, Inc. v. Metropolitan Dade County,* 219 So. 2d 101 (Fla. Dist. Ct. App. 1969), *cert. denied,* 225 So. 2d 911 (Fla. 1969), the taxpayer was an electronics company which manufactured specialized radio equipment. It assembled, cut, soldered, and altered hundreds of component parts and materials in the process of assembling its finished products. Partially finished work could not be disassembled for any other use or purpose. The taxpayer manufactured only against orders and did not maintain an inventory for future sale. If a purchaser did not take equipment when completed, the equipment, being of little use to another purchaser, had only scrap value. The

taxpayer, in attempting to show that "book value" as computed by the Florida Tax Assessor had no relation to "actual value," admitted that there was no going market for its products. The taxpayer claimed that its inventory had only "junk value," but no more than 2% of the inventory had ever been junked, and 98% had ultimately been sold, at a profit, to willing buyers. The court noted that as certain items such as labor were applied to the raw materials of the taxpayer, the value of the raw materials appreciated. The court, in adopting a valuation method based on cost, stated: "In the instant case . . . the Plaintiff's stock in trade consists of work in process, the value of which (cost of which) is increased as it is processed. . . . The original purchase price (invoice price) thus is not the fair market value of the inventory herein." 219 So. 2d at 105. In a New Hampshire case concerning the proper valuation of inventory, the court rejected the argument that goods in process could be valued at scrap value:

> "Among other arguments advanced by the plaintiff for excluding goods in process from taxation (as stock in trade) is that during the transitory period from raw material to finished product goods in process have no sale value except in liquidation at liquidation values as unfinished goods or goods finished at excess costs. . . .

> .   .   .   .

> "To require the selectmen to place a forced sale value upon goods in process and uncompleted would ignore the purpose of the statute and offend the principle that taxation is to be administered in a practical way." *Verney Corporation v. Peterborough*, 104 N.H. 368, 372-73, 188 A. 2d 50 (1962), *aff'd on rehearing*, 104 N.H. 375 (1963).

[2]   At the hearing before the State Board of Assessment, appellee strongly contended that its raw materials, as well as its work in process, should have been valued at scrap value. Appellee's tax manager, Ernest Price, stated that there were no manufacturers of similar products who would purchase the raw materials substantially at cost due to the peculiar nature of the materials: "We have a very special raw material with a very special type of specification and generally speaking no one else can use them because they are made for our specific product." Evidence adduced at the hearing indicates that upon sale of raw materials to the original suppliers, 40% of the cost of

the raw materials is recouped. The effect of appellee's contention is that raw materials purchased for $10,000.00 have a value of $6,000.00 when they arrive at the manufacturing plant and are placed into inventory. Appellee admits that it is not in the business of selling raw materials and that it does not sell its raw materials as scrap. Its witnesses acknowledged that G.S. 105-294 requires valuation at true value in money not at forced sale, but stated that true value in money is best represented by appellee's sales of raw materials as scrap. Such a position is untenable. G.S. 105-294 expressly states that " 'true value' . . . shall be held to mean for the amount of cash or receivables the property and subjects can be transmuted into when sold in such manner as such property and subjects are usually sold." Raw materials are not usually sold as scrap, and the book value (cost), in this instance, is the best evidence of their true value in money.

It is a sound and fundamental principle of law that assessments are presumed to be correct, and the burden of proof to the contrary must necessarily rest with the taxpayer. "It is incumbent upon the property owner clearly to show that the assessment was erroneous, in order to relieve himself from it." 72 Am. Jur. 2d, *State and Local Taxation,* § 713 (1974). Furthermore it has been held in one jurisdiction, in a case concerning the valuation of certain timber lands, that:

> "It is not enough to show that some method other than that adopted by the assessor in making the assessment would be better. In such case it must be shown that the means adopted by that official are wrong and that the result arrived at is greater than the actual cash value of the property assessed . . . .
>
> . . . .
>
> "It appears to be a firmly established rule that the valuation placed upon property by the assessor for the purpose of taxation is *prima facie* correct, and a party assailing such an assessment as excessive must make it clearly appear that the assessment does not represent the fair value of the property assessed." *Weyerhaeuser Land Co. v. Board of Equalization,* 85 Or. 434, 442-43, 165 P. 1164 (1917).

We believe that this principle applies in the case *sub judice.*

572 COURT OF APPEALS [23

[3] We recognize that cost may not always represent "true value in money" as defined in G.S. 105-294. Where cost, for example, contains unnecessary costs of production or overhead not properly associated with the product; where there is evidence that inventory is obsolete and not worth cost; where replacement cost is below cost due to cheaper raw materials or new and more efficient production techniques; and where the manufacturer is not a going concern and a forced sale is anticipated, then cost may not necessarily be evidence of true value in money. In North Carolina the taxpayer has a right to show that his property is worth less than the valuation made by the taxing authority. If such a showing is made, the taxpayer will be taxed on the lower basis. *In re Carolina Quality Block Company,* 270 N.C. 765, 155 S.E. 2d 263. However, we believe, and so hold, that "[t]he prima facie correctness of an assessment when made by the proper officers must be affirmatively overcome by appropriate and sufficient allegations and proofs excluding every reasonable hypothesis of legal assessment." *Aeronautical Communications Equipment, Inc. v. Metropolitan Dade County,* 219 So. 2d 101, 104 (Fla. Dist. Ct. App. 1969), citing *Folsom v. Bank of Greenwood,* 97 Fla. 426, 120 So. 317 (1929). Appellee has failed to overcome its burden. In our opinion there is competent, material, and substantial evidence to support the decision of the State Board of Assessment that appellee undervalued its inventory for the years 1964 through 1968 inclusive. For this reason appellant's assignment of error is meritorious.

Appellant contends that the superior court exceeded its scope of review when it reversed and vacated the decision of the State Board of Assessment. Article 33 of Chapter 143 of the General Statutes provides for judicial review of the decisions of administrative agencies. Specifically G.S. 143-315 establishes the proper scope of review:

"The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

"If the court reverses or modifies the decision of the agency, the judge shall set out in writing, which writing shall become a part of the record, the reasons for such reversal or modification."

[4] It is within the prerogative of the court, and it is its duty, to examine the evidence and reverse or modify the decision of an administrative agency if the decision is unsupported by competent, material, and substantial evidence in view of the *entire* record as submitted. Only the evidence supporting the administrative agency's decision need be looked to; if it is substantial, then the decision of the agency should be upheld. *See* Hanft, *Some Aspects of Evidence in Adjudications by Administrative Agencies in North Carolina,* 49 N.C. L. Rev. 635 (1971).

The North Carolina Supreme Court has stated in this respect that upon review of an order of the State Board of Assessment, the superior court is without authority to make findings at variance with the findings of the State Board when the findings of the State Board are supported by material and substantial evidence. *In re Property of Pine Raleigh Corp.,* 258 N.C. 398, 128 S.E. 2d 855. Furthermore, the superior court is without authority to make findings at variance with the findings of the State Board which are supported by substantial evidence because that is the exclusive function of the State Board of Assessment. *In re Appeal of Reeves Broadcasting Corp.,* 273 N.C. 571, 160 S.E. 2d 728. Courts will interfere with tax assessments because of asserted violations of the due process clause only when the actions of the State Board of Assessment are found to be arbitrary and capricious. *Albemarle Electric Membership Corp. v. Alexander,* 282 N.C. 402, 192 S.E. 2d 811. Accordingly a superior court exceeds its right of review where it substitutes its evaluation of the evidence for that of the Board. *Clark Equipment Co. v. Johnson,* 261 N.C. 269, 134 S.E. 2d 327.

[5] Having found that there is competent, material, and substantial evidence in the record from which the State Board of Assessment could reach a valid conclusion that appellee under-

valued its inventory for the years 1964 through 1968 inclusive, we find that the judgment of the Superior Court reversing and vacating the State Board of Assessment's decision was error. The judgment of the superior court is reversed, and the cause is remanded to the superior court for an order reinstating and affirming the decision of the State Board of Assessment.

Reversed and remanded.

Judges MORRIS and MARTIN concur.